**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

CENTENNIAL BANK, an
Arkansas state chartered bank,

     Plaintiff,

vs.                            CASE NO.

SERVISFIRST BANK INC., an Alabama      Case in other court:
state chartered bank, and GREGORY W.    USDC/MDFL: 8:16-cv-088-CEH-JSS
BRYANT, an individual,

     Defendants.
_____/

**CENTENNIAL'S MOTION TO COMPEL COMPLETE
RESPONSES TO SUBPOENA TO PRODUCE DOCUMENTS SERVED
ON IGLER & PEARLMAN AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rules of Civil Procedure 26 and 45, and other applicable law, Centennial Bank, an Arkansas state chartered bank ("Centennial"), by and through its undersigned counsel, hereby moves on the following grounds for the order of this Court compelling Igler and Pearlman, P.A. ("Igler") to produce all documents responsive to the "Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action" (the "Subpoena")[1] served on Igler on March 30, 2016, the same having been the subject of a set of objections (the "Subpoena Objections")[2]:

**A.     FACTUAL BACKGROUND AND PROCEDURAL OVERVIEW**

1.     On January 14, 2016, Centennial filed the complaint initiating this action (the "Original Complaint") [MD Doc. 1][3] against ServisFirst Bank Inc. ("ServisFirst") and Gregory W. Bryant ("Bryant"), both of whom are together referred to herein as the "Defendants."  On February

---

[1] A copy of the Subpoena is attached hereto as Exhibit "A."
[2] A copy of the Subpoena Objections is attached hereto as Exhibit "B."
[3] For purposes of this motion "MD Doc" will refer to the docket of the underlying action currently pending in the United States District Court for the Middle District of Florida.

19, 2016, Centennial filed the "Verified Amended Complaint" (the "Amended Complaint") [MD Doc. 53] chronicling with additional specific allegations and significant back up documentation the manner in which the Defendants have engaged in a pattern described as "Actionable Misconduct." The Amended Complaint contains twelve (12) causes of action, with additional factual allegations and causes of action not originally included in the Original Complaint, because the details and magnitude of the Defendants' scheme were not fully understood at the time of filing the Original Complaint.

      2.     Broadly speaking, Centennial has sued the Defendants because Bryant violated two (2) non-compete contracts, one executed in favor of Bay Cities Bank ("Bay Cities"), the other executed in favor of Centennial, and then engaged in an elaborate and orchestrated undertaking to defraud Centennial, violate his non-compete agreements, and eviscerate Centennial.  The Actionable Misconduct can be broken down into six (6) steps, as follows:

      a.  **<u>Centennial Announcement of Acquisition of Bay Cities</u>**:  For many years Bryant served as president and CEO at Bay Cities, alongside his senior management team, consisting of Gwynn Davey ("Davey") and Patrick Murrin ("Murrin"), together with their commercial loan officer Jonathan Zunz ("Zunz").[4] When the board of directors of Bay Cities decided to put Bay Cities up for sale during early 2015, Bryant personally persuaded Centennial's senior management to beat a number of other suitors by paying a recent industry record of nearly $101,600,000 for the acquisition of the community bank.  Significantly, Bryant was simultaneously negotiating his own "golden parachute" deal with Centennial and Bay Cities at the same time.  The resulting stock acquisition transaction left Centennial as the successor to Bay Cities, substantially increasing Centennial's Tampa Bay footprint, and putting in place all of Bay Cities' senior management

---

[4] Bryant, Davey, Murrin, and Zunz are collectively referred to herein as the "Departed Officers."

team as the new Tampa leadership of Centennial.  Bryant's obvious motivation to facilitate this transaction was a "golden parachute" package amounting to approximately $2,100,000.  Davey and Murrin also received significant, albeit smaller, immediate cash benefits from the acquisition.  Although personal service contracts are not subject to specific performance against employees as a matter of law, Bryant's statements to Centennial, Bay Cities, the public, and employees of the merged entity confirmed that all of senior management would stay with Centennial after the merger.

b. **<u>Bryant Secretly Interviewing after Centennial Acquisition Announcement</u>**:
Shortly after the acquisition was announced, June 17, 2015, but almost three (3) months before it actually closed, Bryant began marketing his "bank within a bank" to the very financial institutions who competed unsuccessfully against Centennial for the acquisition of Bay Cities.  Bryant, Murrin, and Davey, as well as one of their lawyers, first pitched the deal to Fidelity Bank ("Fidelity"), handing senior management of Fidelity confidential information about Centennial in order to perpetuate discussions aimed at relocating Centennial's entire Tampa senior management to ServisFirst.  When Fidelity passed on Bryant's proposal, presumably on advice of counsel, Bryant next approached CenterState Bank ("CenterState").  He handed CenterState the same confidential information from Centennial that he had also wrongfully disclosed to Fidelity.  Similarly, CenterState also passed on the idea of acquiring a set of senior employees who were bound by non-compete agreements to refrain from competing against Centennial or disclosing confidential information.

3

c. **Bryant and ServisFirst**:  Bryant was undaunted after being rejected by both Fidelity and CenterState.[5]   Bryant seems not to have realized the obvious compelling legal and ethical reasons that both institutions passed on his team.  Again, violating the ethics codes of Bay Cities and Centennial (that like those of most financial institutions are intended to prevent self-dealing and for protection of confidential data), Bryant next approached ServisFirst.  ServisFirst's chairman, Thomas A. Broughton, III ("Broughton"), had also been involved in the vetting of Bay Cities as a potential acquisition.  Even though Centennial's acquisition of Bay Cities was formally closed on October 1, 2015, ServisFirst decided to extend offers to the Bryant team.  Ignoring all of the problems that Fidelity and CenterState could easily see and avoid, ServisFirst's offer letters were sent to Bryant, Murrin, Davey, and Zunz by Broughton and dated December 11, 2015.[6]  The team stayed at Centennial for long enough to receive their year-end bonuses, maximize their vacation benefits, and take advantage of all other available benefits.  On December 31, 2015, Bryant submitted his team's resignation letters in one set to Centennial's president and CEO.

d. **Export of Centennial Data**:  After Bryant and his team departed, Centennial learned that they seemingly worked in an orchestrated effort to export large volumes of private bank records outside of Centennial without Centennial's authority.  These records included (i) detailed contact lists for thousands of bankers, borrowers, vendors, and professionals assembled by Bay Cities and

---

[5] But for the current discovery dispute, Centennial might now be aware of other financial institutions that were approached as well, and that might also have received confidential Centennial banking data which was prohibited by the governing contracts.

[6] The extent to which Bryant, Davey, and Murrin, having received golden parachutes of different sizes from Centennial then "double dipped" by relocating to ServisFirst has not yet been determined.  However, it is readily inferable that while Centennial paid the three officers in consideration of either their retention or their non-competition for a year following severance, ServisFirst is obviously paying a premium for them to breach with Centennial.

Centennial over many years, (ii) detailed account information on deposit accounts totaling approximately $285,000,000, and (iii) all commercial loans within the Tampa Bay market area, sorted strategically for marketing purposes.[7]   Private account information even included data on two law firms and multiple lawyers appearing of record in this cause.  Even assuming arguendo that confidential data was never used, it is incontrovertible that huge quantities of confidential data were exported by Bryant and his team, and it defies common sense that all of them acted independently and not as part of a scheme.  Finally, the information learned by the departed officers, that is within their intellects, independently explains why Centennial acquired Bay Cities and why non-compete agreements are required to enable mergers and acquisitions to occur in this society.

e.   **Defendants Compete Unfairly Against Centennial**:   On January 3, 2016, Bryant became the Tampa Bay president for ServisFirst, just as he had been the Tampa Bay president for Centennial and the president of Bay Cities during the several months preceding his relocation.  Davey, Murrin, and Zunz took on similar positions under Bryant within ServisFirst as well.  Bryant, Davey, and Murrin have all taken the position that because they have an office in Lutz, they are free to engage in any form of competition against Centennial with impunity.  This defies a reasonable reading of the relevant contracts, or a common sense understanding of controlling law.  Although the pendency of the Injunction Motion for a time seems to have dissuaded the Defendants from actually poaching customers, Centennial has now documented several lending and depository relationships leaving Centennial for ServisFirst.  Because Bryant is in

---

[7] The Departed Officers have stated under oath either that they took Centennial bank records, or that they have not used or reforwarded them for use in their positions at ServisFirst.  However, their pattern of stonewalling in discovery both before and after the initiation of this cause tells a different story.

charge of ServisFirst within this footprint, and therefor supervises and directs whatever individuals have been responsible for relocating these relationships, the competition is obvious.[8]

f. **<u>The Defendants' Pretext for Actionable Misconduct</u>**:   With ServisFirst's blessings, Bryant has taken the position that ServisFirst can market directly against Centennial in Tampa Bay in violation of his contractual obligations to Centennial, both in its own right and as successor in interest to Bay Cities. Ignoring his geographically broader non-compete agreement with Bay Cities, Bryant asserts that he can manage a large number of ServisFirst employees all over Tampa Bay to indirectly help ServisFirst to compete against Centennial, so long as he doesn't have a banking branch located in Hillsborough, Pinellas, Sarasota, or Manatee County.   This position ignores the material facts. Specifically:

  i. If Bryant were so sure that his non-compete agreements would enable him to legally eviscerate Centennial's footprint as soon as his $2,100,000 golden parachute was funded, why did he conceal his plans not only from Centennial, but also from Bay Cities, its board, its shareholders, the Securities Exchange Commission, and applicable bank regulators? Bryant and his team were meeting with potential new employers back at a time when Bryant had an affirmative obligation as the CEO of Bay Cities to advise Centennial and others as to whether or not there had been a

---

[8] Bryant's position as a senior officer supervising a broad footprint including but not limited to his own non-compete territories, and supervising a wide range of activity including but not limited to the prohibited conduct, is unique. Bryant's situation is totally different from the situation in which a single junior officer, with or without contractual limitations, migrates by himself, without confidential information (in his head and on his hard drive) to a competitor, to take a position in which he can be isolated (either geographically or in terms of duties), so as to viably remain employed without competing against his former employer.

"material adverse change" that might impact the desirability of the transaction.  However, he pursued his plans furtively, so that the acquisition could close and he could get his money.

ii.  Bryant's non-compete agreement with Bay Cities has been validly assigned to Centennial, as readily confirmable by relevant provisions of the merger documents by which Centennial acquired Bay Cities, as well as the assignability provisions of the non-compete agreement itself.  If Bryant elected to terminate this contract, he was required to give written notice, which he did not.  This operative contract precludes all manner of competition within a 75 mile radius measured from Westshore Blvd. in Tampa.  But instead he simply states that it is inapplicable, without any basis.

iii.  The non-compete executed by Bryant with Centennial only a few months before his departure precluded any form of competition for customers and employees, without geographical limitations.  And yet Bryant seems to forget that he got on an airplane leaving from Tampa, Florida, to fly with to Atlanta, Georgia, with the Davey and Murrin, to interview at Fidelity, as part of his team, about a month after he signed that contract and later took his initial Centennial money.  This was an obvious violation of his fiduciary duty to refrain from disloyalty to Centennial, his duties under the ethics codes of both Bay Cities and Centennial, his fiduciary duty to facilitate the merger pending acceptance by shareholders and other regulatory approvals, and both non-compete agreements.  Florida law makes no distinction between who contacted whom, and Bryant's

contentions that he is not presently recruiting Centennial officers is belied by his track record as borne out in the documents obtained to date.

iv. With respect to the four county prohibition in the non-compete agreement executed by Bryant in favor of Centennial, specific conduct is prohibited, so the location of a branch is immaterial to the analysis. And yet Bryant seems to think that he can take any action within Centennial's footprint, no matter how clearly it is contractually prohibited or otherwise illegal, so long as he maintains an office in Lutz rather than Tampa.

v. Bryant's marketing materials to Fidelity, CenterState, and ServisFirst reflect his erroneous belief that he could work through straw men to avoid his obligations under his non-compete agreements. However, the contracts at issue clearly provide that Bryant cannot work "directly or indirectly" to subvert the intent of the agreement that he not be permitted to compete against Centennial, in its own right or as successor to Bay Cities. Even if the contracts themselves had not been drafted this clearly, Florida law is nonetheless pellucid that indirect violations of a non-compete agreement are still violations: there is no common law safe harbor that rewards breaching parties for creating straw men to perpetuate tortious behavior.

3. Based upon Bryant's conduct, it is clear that Centennial never would have acquired Bay Cities had it known before the announcement date or before the acquisition date that Bryant and his fellow senior management officers were hatching a plan to immediately relocate once their golden parachutes were packed with cash; Centennial paid a record amount for the assets of a small community bank, those assets primarily consisting of confidential information, human resources, lending and depository relationships, and other going concern value that Bryant sabotaged in

exchange for $2,100,000.   ServisFirst was perfectly happy to acquire the primary assets that Centennial paid for, and the four defectors were happy to "double dip" by offering a significant value in terms of all of their Centennial contacts and confidential information.  Centennial's investment and expansion strategy in this geographic area has been seriously impacted, leading to damages that can't be measured strictly in terms of dollars.  Centennial's closing documents released Bay Cities from representations and warranties that were not intended to survive closing; however, those same documents made clear that there were no third-party beneficiaries to the release provisions or any other provisions.  Bryant willfully defrauded Centennial and ServisFirst has aided and abetted the resulting breaches of contract, breaches of ethical codes, breaches of relevant statutes, and breaches of fiduciary duty.

4.      On January 15, 2016, Centennial filed the injunction motion (the "Injunction Motion") [MD Doc. No. 4] seeking both a temporary restraining order ("TRO") and preliminary injunction enjoining the Defendants from continuing to engage in the Actionable Misconduct pending adjudication of the Complaint.   On January 22, 2016, this Court entered its "Order" (the "TRO Order") [MD Doc. No. 15] denying the Injunction Motion to the extent it seeks a TRO, but construing the Injunction Motion as seeking a preliminary injunction, in the alternative, and reserving its ruling on the same.  On February 11, 2016, ServisFirst filed its objection to the Injunction Motion (the "ServisFirst Preliminary Injunction Objection") [MD Doc. No. 35] and Bryant simultaneously filed a very similar objection (the "Bryant Preliminary Injunction Objection") [MD Doc. No. 36], together referred to as the "Preliminary Injunction Objections."  The merits of the Injunction Motion and the Preliminary Injunction Objections were considered at a two-day evidentiary hearing that began on April 26, 2016 and concluded on April 28, 2016 (the "Injunction Hearing").

5.      On March 7, 2016, ServisFirst filed its renewed dismissal motion (the "Renewed ServisFirst Dismissal Motion") [MD Doc. No. 72] and Bryant against simultaneously filed his own renewed dismissal motion (the "Renewed Bryant Dismissal Motion") [MD Doc. No. 73], both of

which are together referred to as the "Renewed Dismissal Motions." The Renewed Dismissal Motions, like prior motions filed by the Defendants in response to the Original Complaint, seek to have this case dismissed based upon a summary judgment standard while at the same time the Defendants have steadfastly refused to cooperate with basic discovery at this early stage of this cause. On March 21, 2016, Centennial filed its responses to the Renewed Dismissal Motions (the "Centennial Responses") [MD Doc. Nos. 80 and 81]. Additionally, Centennial filed its response to the Renewed Discovery Stay Motion [MD Doc. No. 82].

      6.     The following specific acts of the Defendants reflect a sustained pattern of delaying and otherwise frustrating Centennial's efforts to propound discovery:

      a.   Before this cause was initiated, Centennial made demand for documents in order to confirm or rebut the proposition that the Defendants were in possession of confidential materials wrongfully taken from Centennial. However, after initially indicating that access and production would be forthcoming, it was ultimately refused.

      b.   When Centennial sought injunctive relief, the Defendants objected categorically to all manner of expedited discovery.

      c.   When Centennial sought to treat a hearing on a pending motion for injunctive relief as evidentiary, the Defendants objected.

      d.   The Defendants filed initial dismissal motions[9] responding to the Original Complaint, that contended that the Original Complaint did not meet the notice pleading standard established by the Supreme Court in Ashcroft v. Iqbal, 29 S.Ct. 1937 (2009), even though that standard requires the assumption that the

---

[9] The Defendants' filed their initial dismissal motions (the "Initial Dismissal Motions") [MD Doc. Nos. 30 and 31] on February 5, 2016.

allegations are true with appropriate deference to reasonable inferences to be drawn in favor of the plaintiff.

e.   The Defendants moved to stay discovery [MD Doc. No. 51] while their Initial Dismissal Motions were pending with this Court.

f.   When Centennial filed the Amended Complaint, the Defendants filed dilatory Renewed Dismissal Motions seeking to dismiss the Amended Complaint, based upon a litany of summary judgment case law that in no way meets the procedural stage at which this Court finds this action and again moved a second time to stay discovery [MD Doc. No. 74].

g.   The Defendants refused to participate in a Rule 26 conference with Centennial until the very last day possible under Local Rule 3.05.

**B.      ALLEGATIONS RELATING TO SPECIFIC RELIEF REQUESTED**

7.      Centennial served the Subpoena on Igler on March 30, 2016.  The Subpoena requested that Igler produce documents within its respective possession.

8.      On April 12, 2016, Igler served the Subpoena Objections on Centennial.  The canned Subpoena Objections fit the pattern of the Defendants' penchant for delaying discovery compliance. The Subpoena Objections is a mere form that articulates the exact same vague and general objections to each request for documents.

9.      Igler objected to the Subpoena as a whole.  Despite Igler's overbroad and boilerplate objections, a small number of documents were produced by Igler on April 15, 2016.  The documentation of Igler (the "Igler Documents") is attached hereto as Exhibit "C."  The Igler Documents were accompanied by a privilege log (the "Privilege Log").  A copy of the Privilege Log is attached hereto as Exhibit "D."

10.      On May 3, 2016, Centennial's counsel had a conference call with Igler's counsel to discuss the Subpoena Objections, Igler Documents and Privilege Log.   Centennial's counsel

communicated to Igler's counsel that many of the documents withheld on the basis of attorney-client privilege seemed to be documents that belonged to Bay Cities (the "Bay Cities Documents"), and therefore Centennial as successor-in-interest.  Igler's counsel agreed to turn over the Bay Cities Documents with the proper authorization from Centennial.  Igler's counsel also agreed to furnish a revised and updated privilege log.

11.     On May 4, 2016, Centennial provided Igler with the requested authorization to provide Centennial's counsel with any and all documents between Igler and Bay Cities that are within the possession of Igler and were initially withheld on a basis of attorney-client privilege.

12.     On May 9, 2016, Igler produced the Bay Cities Documents along with a revised privilege log (the "Revised Privilege Log").  A copy of the Revised Privilege Log is attached hereto as Exhibit "E."

13.     Upon review of the Revised Privilege Log it seems that a number of documents were still withheld from production on the basis of attorney-client privileged, however, the Revised Privilege Log does not provide the required information to allow Centennial to determine whether or not the attorney-client privilege actually applies.

### C.     MEMORANDUM OF LAW

Federal Rule of Civil Procedure 45 governs discovery of non-parties by subpoena and permits a party to a federal lawsuit to issue a subpoena compelling the production of documents. See Fed. R. Civ. P. 45(a); Stringer v. Ryan, 2009 WL 3644360 (S.D. Fla. Oct. 30, 2009) ("A party to [a] federal lawsuit may issue a subpoena to a nonparty, compelling the production of documents relevant to any of the parties' claims or defenses.").  Centennial has served the Subpoena in reliance upon the foregoing, and is entitled to enforcement of the same.

#### a.     The Subpoena Objections are inappropriate and should be overruled.

Igler contends that the discovery sought pursuant to the Subpoena is irrelevant, overly broad and impermissible – all arguments which are conclusory and fallacious in light of the fact that

12

information within Centennial's own possession absent discovery shows that Bryant orchestrated a surreptitious plan to leave Centennial shortly after the Acquisition taking with him Centennial's Confidential Information and key senior management.  Centennial has it upon good authority that Bryant utilized Igler to communicate with other financial institutions and negotiate Bryant's departure from Centennial.  Centennial believes that Igler is in possession of key documents that will unveil the extent of Bryant's duplicity and deception as he strung Centennial along with the faulty promise that he would stay with Centennial while at the same time negotiating employment opportunities with other financial institutions on behalf of him and Centennial's local senior management.

i.      **The Subpoena Objections are impermissibly vague and ambiguous.**

The Subpoena Objections' boilerplate contention that the Subpoena is overbroad lacks merit. See e.g., Belaire at Boca, LLC v. Ass'n Ins. Agency, Inc., 2007 WL 2177212, at *1 (S.D. Fla. 2007) ("a party must show specifically how the requested discovery is burdensome, overbroad, or oppressive by submitting detailed affidavits or other evidence establishing the undue burden"); Fin. Bus. Equip. Sol., Inc. v. Quality Data Sys., 2008 WL 4663277, at *5 (S.D. Fla. 2008) (overruling non-specific boilerplate objections and holding that "[t]he objecting party must do more than intone the familiar litany that the [discovery is] burdensome, oppressive or overly broad").  Here, Igler has not made any particularized showing by way of affidavit or other evidence of the specific amount of time and the monetary cost (if any) of responding to the Subpoena.  Nor has Igler revealed what efforts it actually made to identify or obtain any of the documents requested.  It is clear from Igler's bare responses that no such efforts have been made at all.  Such "unsubstantiated boilerplate objections … are, ironically, themselves overbroad and vague." Platypus Wear, Inc. v. Clarke Modet & Co., Inc., 2007 WL 4557158, at *3.  "[T]hese Objections [are] worthless for anything beyond delay of discovery … [and] do not constitute objections." Id.  Following the Platypus Wear analysis, Centennial urges that the Subpoena Objections served by Igler in the present context are equally

13

"worthless."

**ii.    Igler's privilege objections are conclusory and baseless.**

Igler has withheld eight (8) separate documents comprised of fifteen (15) pages on the basis of attorney-client privilege.  Igler has the burden in "demonstrating that compliance with the subpoena[s] requires the disclosure of privileged or protected information, or that compliance presents an undue burden." Black Knight Financial Services, Inc. v. Powell, 2014 WL 10742619, at *2 (M.D. Fla. Dec. 11, 2014) (citing Wiwa v. Royal Dutch Petroleum Co., 392 F. 3d 812, 818 (5th Cir. 2004); Int'l Assoc. of Machinists v. P&B Trans., 2007 WL 4145974, at *2 (M.D. Fla. Nov. 19, 2009).  Under Rule 26(b)(5)(A), "[w]hen a party withholds information otherwise discoverable by claiming that the information is privileged," the party must: "(1) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  Furthermore, under Rule 45(e)(2), the entity seeking protection from production based upon "a claim that it is privileged or subject to protection as trial preparation materials … shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim."  Fed. R. Civ. P. 45(e)(2).  Moreover, as the Advisory Committee Note to Rule 45(e) explains, "[Rule 45(e)(2)'s] purpose is to provide a party whose discovery is constrained by a claim of privilege or work product protection with information sufficient to evaluate such a claim and to resist if it seems unjustified.

The attorney-client privilege is only available when all the elements are present. Bozeman v. Chartis Cas. Co., 2010 WL 4386826, at *3 (M.D. Fla. Oct. 29, 2010); see also Universal City Development Partners, Ltd. v. Ride & Show Engineering, Inc., 230 F.R.D. 688, 690 (M.D. Fla. 2005) (citing Provenzano v. Singletary, 3 F.Supp.2d 153, 1366 (M.D. Fla. 1999) aff'd, 148 F. 3d 1327 (11th Cir. 1998)).  "The elements of the attorney-client privilege are: (1) where legal service advice

of any kind is sought, (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected, (7) from disclosure by himself or by the legal advisor, (8) except the protection may be waived." Id.  Simply put, the attorney-client privilege protects from disclosure only confidential communications between a lawyer and his client. See Id.; Florida Statutes § 90.502(c).  As noted above, Igler, as the party asserting the privilege, has the burden of proving the existing of the privilege and establishing that each communication or document sought to be produced falls within the privilege protection. Id.

In this instance, Igler has not met its burden to show that the attorney-client privilege applies to the documents listed in its Revised Privilege Log.  A few observations on behalf of Centennial provides a worthy reply to the nebulous privilege objections as they stand now:

    a. Igler has failed to establish whether or not any attorney-client relationship existed between Igler and Bryant, to the extent the attorney-client privilege would attach. At the Injunction Hearing, Bryant was asked a series of questions relating to his relationship with Igler to which Bryant answered, under oath, that he went to Igler as a friend, did not enter into any engagement agreement with Igler, and did not otherwise pay Igler for any purported advice Bryant received.[10]  Therefore, there is still a question as to whether Bryant was ever a "client" of Igler.

    b. Documents 19 and 20 identified on the Revised Privilege Log purport to represent memorandums authored by Igler which were stored in Igler's files.  The attorney-client privilege does not protect every document prepared by counsel and shared with staff or co-counsel, even if that document concerns the client's legal representation. See Boyles v. Mid-Florida Television Corp., 431 S. 2d 627, 639 (Fla. 5th DCA 1983) (the attorney-client privilege does not extend beyond

---

[10] The transcript from the Injunction Hearing is still being processed.

the substance of the client's confidential communications to the attorney and his attorney's response thereto; it does not place a cloak of secrecy around all of the incidences of the transaction). Igler appears to suggest that because the documents reflect Igler's authorship and concerns Bryant, they invoke the attorney-client privilege. Igler's position is inaccurate and intentionally confuses two legal doctrines. When information sought to be withheld does not constitute confidential communications from or to the client, it is not protected by the attorney-client privilege. Universal City Development Partners, 230 F.R.D. at 693 (communications between two attorneys concerning litigation strategy to employ on the client's behalf is not protected by the attorney-client privilege).

c.  It is unclear whether or not Igler ever obtained the proper conflict waiver from Bay Cities to represent Bryant individually at a time when Bryant's intentions were contrary to Bay Cities/Centennial's. From June 2015 through December 2015, Bryant orchestrated a plan to leave Centennial, violate his noncompete agreements that inure to the benefit of Centennial, and deprive Centennial of its benefit of the bargain in acquiring Bay Cities. The Revised Privilege Log indicates that Igler communicated with Bryant regarding his noncompete agreements at the same time in which Igler was representing Bay Cities. To the extent this communication was adverse to Bay Cities interest, and that of Centennial's as successor-in-interest to Bay Cities, Igler would have been required to obtain a conflict wavier under Rule 4-1.7, Florida Rules of Professional Conduct.

d.  In Igler's transmittal letter transmitting the Bay Cities Documents and Revised Privilege Log (the "Transmittal Letter"), Igler stated that some documents were withheld because they were sent to Bryant's Bay Cities e-mail address and "it is

16

not clear whether Bay Cities ever had potential or actual access to that email." Therefore, Igler contends that such communications are protected by the attorney-client privilege.  A copy of the Transmittal Letter is attached hereto as Exhibit "F."  While at Bay Cities, Bryant operated under Bay Cities Personnel Policy (the "Personnel Policy), which covers, inter alia, communications through e-mail. The Personnel Policy provides in pertinent part that "telephones, voice mail systems, and computers, including electronic mail systems (e-mail) are provided for business use.  Excessive personal use of these devices is prohibited. Communication through these devices is subject to monitoring by the bank."  A copy of the Personnel Policy is attached hereto as Exhibit "G."  Therefore, Bryant had no expectation of privacy when communicating using his Bay Cities e-mail address and the attorney-client privilege would not apply to any communications between Bryant and Igler through Bryant's Bay Cities e-mail address.

Given the deficiencies in Igler's assertions of privilege, it is likely that there are other materials that are being withheld which would not be privileged, and thus subject to production.  Igler has the burden of proof as the party claiming the privilege and has failed to meet its burden here.  The "attorney-client privilege is not a favored evidentiary concept in the law since it serves to obscure the truth, and it should be construed as narrowly as is consistent with its purpose. United States v. Suarez, 820 F. 2d 1158, 1160 (11th Cir. 1987); see also United States v. Nixon, 418 U.S. 668, 710, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974) (this burden is heavy because privileges are "not lightly created nor expansively construed, for they are in derogation of the search for the truth."); See also United States v. Bryan, 339 U.S. 323, 331, 70 S. Ct. 724, 94 L. Ed. 884 (1950) (privileges contravene the fundamental principle that "the public … has a right to every man's evidence").  Accordingly, Igler's assertions of privilege for any of the documents identified on the Revised Privilege Log should be overruled.  At a minimum, the Court should conduct an in camera inspection of these

materials withheld to determine whether Igler's assertions of privilege are appropriate.

**iii.    Igler's Revised Privilege Log is deficient.**

"A proper privilege log should contain the following information: (1) the name and job title or capacity of the author of the document; (2) the name and job title or capacity of each recipient of the document; (3) the date the document was prepared and if different, the date(s) on which it was sent to or shared with persons other than the author(s); (4) the title and description of the document; (5) the subject matter addressed in the document; (6) the purpose(s) for which it was prepared or communicated; and (7) the specific basis for the claim that it is privileged." Bozeman, 2010 WL 4386826, at *3-4 (M.D. Fla. Oct. 29, 2010); see also Roger Kennedy Construction, Inc. v. Amerisure Insurance Co., 2007 WL 1362746, *1 (M.D. Fla. May 7, 2007).

The Revised Privilege Log is deficient as it fails to indicate the requests to which each of the purportedly privileged documents is responsive, the purpose for which the documents were prepared or communicated, and the specific basis for the claim that the documents are privileged. See Id.  As a result, Centennial is unable to determine the propriety of Igler's assertions of privilege.  Centennial is unable to ascertain whether all of the documents listed on the Revised Privilege Log were communicated to Bryant in confidence and constitute proper legal advice that would be subject to the attorney-client privilege.  Many of the documents withheld purport to be mere opinions and advice, and do not constitute legal opinions that would be protected by the attorney-client privilege.  For these reasons and the reasons set forth above, Igler's assertions of privilege for any of the documents identified on the Revised Privilege Log should be overruled.  At a minimum, the Court should conduct an in camera inspection of these materials withheld to determine whether Igler's assertions of privilege are appropriate.

**b.      Igler should be compelled to
produce an affidavit describing its search efforts.**

Rule 45 requires Igler to produce all responsive documents pursuant to the Subpoena, and in

fulfilling this obligation, it is well-settled that Igler's responses to the Subpoena must be

> full, complete and unevasive.  The answer[ing] party cannot limit his answers to matters within his own knowledge and ignore information immediately available to him or under his control … [i]f the answering party lacks necessary information to make a full, fair and specific answer … it should so state under oath and should set forth in detail the efforts made to obtain the information.

Stone v. Zimmer, Inc., 2009 WL 9567924, *2 (S.D. Fla. Dec. 4, 2009) (citing Molinos Valle Del Cibao v. Lama, 2008 WL 3850807, *3 (S.D. Fla. Aug. 14, 2008).

When it is apparent from documents produced in response to a subpoena that the responding party has not produced all documents in its possession, custody, or control, a court will order complete production of responsive documents. See e.g Kilpatrick v. Berg, Inc., 2009 WL 1764829, at *3 (S.D. Fla. June 22, 2009) (granting plaintiff's motion to compel complete production of documents when an email produced indicated a meeting had taken place but no documents were produced memorializing such meeting).  Moreover, "when it reasonably appears that a response is incomplete the court may require certification that the nonparty has 'conducted a search for the information reasonably available to them through their agents, attorneys, or others subject to their control and has[] determined that the information requested either does not exist or that it has been produced.'" Bailey Indus., Inc. v. CLJP, Inc., 270 F.R.D. 682, 671-72 (N.D. Fla. 2010).  Finally, a subpoenaed party has an obligation to engage in sufficient investigation to uncover as much information as possible, and to produce all responsive documents that are in their "control," not simply what is in their "possession." See Searock v. Stripling, 736 F. 2d 650, 653 (11th Cir. 1984).  Failure to engage in a sufficient investigation of responsive documents will result in the court compelling the subpoenaed party to provide a complete and proper response. See Joyner v. RexCorp., 2007 WL 1099106, at *4 (M.D. Fla. April 10, 2007).

While it is apparent that Igler has failed to fully comply with the Subpoena, and that it likely has numerous documents responsive to the Subpoena, to the extent that Igler still maintains that no documents exist in their possession, custody, or control responsive to any of the subpoena requests,

that are not privileged, Igler should be directed to file a sworn affidavit detailing the steps taken to comply with its obligation to produce all responsive records within its possession, custody and/or control, and swearing to the non-existence of responsive documents.  If responsive documents previously existed which have now been lost, destroyed, or transferred, Igler's affidavit should include a detailed explanation of the date and circumstances leading to the document(s) loss/destruction/transfer.  The affidavits should also include an explanation as to the means by which responsive documents, which may once have exited in Igler's possession, custody, and/or control, but have now been lost, destroyed, or transferred, were obtained in the first place by Igler.

### D.     <u>LOCAL RULE 7.1(B) CERTIFICATION</u>

The undersigned hereby certifies that counsel for Centennial has attempted in good faith to confer with counsel for Igler in an effort to address this discovery dispute.  Conference calls occurred on April 12, 2016, on April 15, 2016, and again on May 3, 2016 and it is clear that the positions have been adequately vetted.  In addition to the two (2) conference calls counsels for Centennial and Igler exchanged extensive e-mail communications regarding the subject matter of this motion.  Despite extensive discussions counsels for Centennial and Igler were unable to come to an amicable agreement regarding this discovery dispute.

### E.     <u>CONCLUSION</u>

The Subpoena is in all respects reasonable and not objectionable.  The Subpoena Objections are in all respects unhelpful to Centennial and to this Court in understanding the reasons for noncompliance.  It is therefore appropriate to compel compliance to the extent reasonable under the circumstances.

WHEREFORE, Centennial respectfully requests that this Court enter an order that will:

a.  overrule the Subpoena Objections;

b.  direct Igler to produce all documents responsive to the Subpoena that are within Igler's possession, custody, or control;

20

c.  conduct an <u>in camera</u> inspection of any withheld documents;

d.  direct Igler (to the extent appropriate) to submit an affidavit to Centennial that will

   confirm:

   i.   its efforts taken to identify and produce documents in response to the Subpoena;

   ii.  the absence of responsive documents following a diligent search; and

   iii. the extent to which documents have been lost or destroyed that would otherwise

        be subject to production, so as to explain the actual scope and extent of

        compliance;  and

e.  grant for such other relief as is appropriate and just in the circumstances.

/s/ John A. Anthony
**JOHN A. ANTHONY, ESQ.**
Florida Bar Number:  0731013
janthony@anthonyandpartners.com
**ANDREW J. GHEKAS, ESQ.**
Florida Bar Number:  119169
aghekas@anthonyandpartners.com
Anthony & Partners, LLC
201 North Franklin Street, Suite 2800
Tampa, Florida 33602
Telephone:  (813) 273-5616
Telecopier:  (813) 221-4113
Attorneys for Centennial

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via

electronic means and/or first class U.S. Mail on this 10th day of May, 2016, to the following:

Sean P. Keefe, Esq.
James Hoyer, P.A.
One Urban Centre, Suite 550
4830 W. Kennedy Blvd.
Tampa, FL 33609
skeefe@jameshoyer.com

Burt W. Wiand, Esq.
Gianluca Morello, Esq.
Wiand Guerra King PL
Wiand Guerra King P.A
5505 W Gray St
Tampa, FL 33609-1007
bwiand@wiandlaw.com
gmorello@wiandlaw.com

Michael T. Sansbury, Esq.
Spotswood Sansom & Sansbury
1819 Fifth Avenue North
Suite 1050
Birmingham, AL 35203
msansbury@spotswoodllc.com

A. George Igler, Esq.
Robert J. Angerer, Jr., Esq.
Igler and Pearlman, P.A.
2075 Centre Pointe Boulevard, Suite 100
Tallahassee, FL 32308
George.igler@iglerlaw.com
Rob.angerer@iglerlaw.com

/s/ John A. Anthony
**ATTORNEY**