UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CENTENNIAL BANK,

      Plaintiff,

v.                                                                    Case No: 8:16-mc-00082-CEH-JSS

SERVISFIRST BANK INC. and
GREGORY W. BRYANT,

      Defendants.

_____/

## ORDER

THIS MATTER is before the Court on Plaintiff Centennial Bank's ("Centennial")
Amended Motion to Compel Complete Responses to Subpoena to Produce Documents Served on
Igler & Pearlman, P.A. ("Motion to Compel") (Dkt. 3) and the responses in opposition to the
Motion to Compel filed by non-party Igler & Pearlman, P.A. ("Igler") (Dkt. 5) and Defendant
Gregory Bryant (Dkts. 6, 7) and Centennial's Motion to Open the Record Regarding Igler &
Pearlman Discovery Controversy ("Motion to Open") (Dkt. 21) and the responses in opposition to
the Motion to Open filed by Igler (Dkts. 28, 29) and Mr. Bryant (Dkts. 30, 31).  On August 11,
2016, the Court held a hearing on the Motion to Compel at which attorney George Igler testified.
After the hearing on the Motion to Compel, the Court conducted an *in camera* review of the
documents Centennial seeks in the Motion to Compel.  For the reasons that follow, the Motion to
Compel is granted in part and denied in part and the Motion to Open is denied.

## BACKGROUND

This case concerns alleged violations of the non-compete provisions in the employment
contracts of several of Centennial's former employees.  In June 2015, Centennial announced its

acquisition of Bay Cities Bank ("Bay Cities"), which closed in October 2015.  (Case No. 8:16-cv-00088-CEH-JSS Dkt. 53 ¶ 7(b).)[1]

In connection with the acquisition, Centennial retained several former Bay Cities employees to aid in the integration of its Tampa Bay area branches, specifically Mr. Bryant, the former CEO of Bay Cities, Patrick Murrin, former Chief Risk Manager and Executive Vice President of Bay Cities, and Gwynn Davey, Bay Cities's former Market President of Hillsborough County.  (*Id.* ¶¶ 13, 26–27.)  Mr. Bryant, Mr. Murrin, and Ms. Davey signed employment contracts with Centennial that included provisions governing the maintenance of Centennial's confidential information, noncompetition, non-solicitation of Centennial's customers, and non-solicitation of Centennial's employees.  (*Id.* ¶¶ 24–25; Ex. 6–8.)  On December 31, 2015, Mr. Bryant, Mr. Murrin, and Ms. Davey simultaneously resigned from Centennial and, in January 2016, began working for ServisFirst Bank, Inc. ("ServisFirst").  (*Id.* ¶¶ 42–44, 49, 53.)  Shortly thereafter, on January 14, 2016, Centennial filed suit against ServisFirst and Mr. Bryant.

In connection with its lawsuit, Centennial issued a subpoena to Igler, seeking documents it contends are relevant to the allegations in the Amended Complaint.  (Dkt. 3-1.)  In response, Igler produced responsive documents and withheld others, contending they are comprised of attorney-client privileged material and protected from disclosure.  (Dkts. 3-2–3-4.)  Igler provided a revised privilege log concerning the documents it withheld from production.  (Dkt. 3-5.)  In the Motion to Compel, Centennial moves to compel Igler's production of documents Igler identified on its revised privileged log as document numbers 15, 16, 17, 19, 20, 23, 26, and 27 ("Withheld Documents").  (Dkt. 3-5.)

---

[1] See *Centennial Bank v. ServisFirst Bank Inc. et al.*, Case No. 8:16-cv-00088-CEH-JSS (filed Jan. 14, 2016).

On August 11, 2016, the Court held an evidentiary hearing on the Motion to Compel, at which counsel for Centennial, Mr. Bryant, ServisFirst, and Igler appeared and at which Mr. Igler testified.  At the evidentiary hearing, Mr. Igler stated that Igler began representing Bay Cities in the late 1990s.  (Dkt. 23.)  When Mr. Bryant joined Bay Cities as its CEO, Mr. Igler stated that Bay Cities's chairman advised Igler that it could answer Mr. Bryant's personal legal questions if they did not conflict with Bay Cities's interests.  (Dkt. 23.)  Mr. Igler testified that Igler represented Bay Cities in June 2015, but was not representing it in November 2015.  (Dkt. 23.)  In its response to the Motion to Compel, Igler states that it did not serve as primary counsel for Bay Cities during its acquisition by Centennial, but did advise Bay Cities as to certain matters regarding Centennial's acquisition, including providing Bay Cities a legal opinion.  (Dkt. 5 ¶¶ 6–7.)  Mr. Igler testified that Igler never represented Centennial.  (Dkt. 23.)

After the evidentiary hearing, Centennial filed the Motion to Open, requesting that the Court re-open the evidentiary record in order to accept the declaration of A. Bronson Thayer, Bay Cities's former chairman.  (Dkt. 21.)  Mr. Thayer's declaration, Centennial contends, would refute Mr. Igler's testimony that Mr. Thayer, as Bay Cities's chairman, "provided Mr. Igler any sort of blanket conflict waiver to represent Mr. Bryant regarding any matter."  (Dkt. 21 ¶ 10.)  Centennial argues that Mr. Thayer's declaration will aid the Court in determining the credibility of Mr. Igler's testimony regarding Bay Cities providing Igler an oral waiver of conflict arising from Igler's representation of Mr. Bryant.  (Dkt. 21 ¶ 11.)  Thus, Centennial requests that the Court "open the record . . . to the extent that this Court considers any aspect of Mr. Igler's testimony to be probative with respect to" Centennial's argument that Igler's representation of Mr. Bryant conflicted with its representation of Bay Cities, which precluded the formation of an attorney-client relationship between Mr. Bryant and Igler.  (Dkt. 21 ¶ 20.)

## APPLICABLE STANDARDS

Courts maintain great discretion to regulate discovery. *Patterson v. U.S. Postal Serv.*, 901 F.2d 927, 929 (11th Cir. 1990). The court has broad discretion to compel or deny discovery. *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1306 (11th Cir. 2011). Through discovery, parties may obtain materials that are within the scope of discovery, meaning they are nonprivileged, relevant to any party's claim or defense, and "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). If a person withholds information requested by a subpoena under a claim of privilege, the person must "expressly make the claim" and "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." *Id.* at 45(e)(2)(A).

As here, when a court's jurisdiction is based on diversity of citizenship (Case No. 8:16-cv-00088-CEH-JSS Dkt. 53 ¶¶ 1–4), substantive matters are governed by state law. *Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1306 (11th Cir. 2002); *Guar. Trust Co. of N.Y. v. York*, 326 U.S. 99, 112 (1945) ("The source of substantive rights enforced by a federal court under diversity jurisdiction, it cannot be said too often, is the law of the States."); *Bradford v. Bruno's, Inc.*, 94 F.3d 621, 622 (11th Cir. 1996) ("Only state law of a substantive, as opposed to procedural, nature is applicable in diversity cases").

A federal court with diversity jurisdiction "appl[ies] the substantive law of the forum state." *Admiral Ins. Co. v. Feit Mgmt. Co.*, 321 F.3d 1326, 1328 (11th Cir. 2003). Accordingly, in diversity actions, determining the "the privileged nature of material sought in discovery" is controlled by state law. *Somer v. Johnson*, 704 F.2d 1473, 1478 (11th Cir. 1983); *Devault v. Isdale*, No. 615CV135ORL37TBS, 2016 WL 25956, at *2 (M.D. Fla. Jan. 4, 2016) ("When the Court's jurisdiction is based on diversity, state law controls on the substantive issue of attorney-client

privilege").  Therefore, Florida law governing attorney-client privilege applies in determining

whether the Withheld Documents are protected from discovery by the attorney-client privilege.

## ANALYSIS

In the Motion to Compel, Centennial contends that Mr. Bryant "utilized Igler to

communicate with other financial institutions and negotiate Bryant's departure from Centennial"

and thus Igler possesses documents relevant to Centennial's allegations in the Amended

Complaint.  (Dkt. 3 at 18.)  Centennial thus seeks production of the Withheld Documents.  (Dkt.

3.)  Igler and Mr. Bryant timely opposed production of the Withheld Documents, asserting that

they are protected from production by the attorney-client privilege between Mr. Bryant and Igler.

(Dkts. 3-2, 3-4, 5, 5-1, 6, 7.)  After the hearing on the Motion to Compel, upon the Court's order

(Dkt. 32), Igler submitted the Withheld Documents for the Court's *in camera* review.

Centennial contends that Igler and Mr. Bryant have not shown that the Withheld

Documents are protected from disclosure by the attorney-client privilege because they have not

demonstrated that an attorney-client relationship exists between them.  (Dkt. 3.)  Specifically,

Centennial argues that an attorney-client relationship has not been demonstrated because (1) Mr.

Bryant did not formally retain or pay Igler for its services, (2) Igler was precluded from

representing Mr. Bryant because such representation conflicts with Igler's representation of Bay

Cities, and (3) Mr. Bryant did not have a reasonable expectation of privacy in the communications

he had with Mr. Igler using Mr. Bryant's Bay Cities e-mail account because this e-mail account

was subject to monitoring by Bay Cities.  (Dkt. 3 at 22–25.)  Further, Centennial contends that

Withheld Documents 19 and 20 are not protected from disclosure by the attorney-client privilege

because they are not confidential communications between Igler and Mr. Bryant, but instead are

memoranda prepared by Mr. Igler as part of Igler's files and were not shared with Mr. Bryant. (Dkt. 3 at 22–23.)

## I.     Attorney-Client Relationship Between Mr. Bryant and Igler

Centennial contends that Igler has not met its burden of demonstrating that the attorney-client privilege applies to the Withheld Documents because at the evidentiary hearing on Centennial's motion for entry of a preliminary injunction,[2] Mr. Bryant testified that "he went to Igler as a friend, did not enter into any engagement agreement with Igler, and did not otherwise pay Igler for any purported advice Bryant received."  (Dkt. 3 at 22.)  Thus, Centennial contends, Igler has failed to show the formation of an attorney-client relationship with Mr. Bryant.  (Dkt. 3 at 21–22.)

As to his relationship with Mr. Bryant, Igler contends that, during Centennial's acquisition of Bay Cities, Mr. Bryant "was presented with a draft non-compete agreement by Centennial" to execute to consummate the acquisition.  (Dkt. 5 ¶ 8.)  Mr. Bryant contacted Mr. Igler "in order to obtain legal advice regarding the meaning of the provisions contained in the draft Agreement" and provided "Igler with a draft copy of the Agreement to be reviewed."  (Dkt. 5 ¶ 9.)  On June 18, 2015, Igler reviewed the draft agreement and provided Mr. Bryant with an opinion letter regarding the agreement's provisions.  (Dkt. 5 ¶ 10.)  Igler states that, at Mr. Bryant's request, "that letter was sent as an attachment to an email to Bryant's email address at Bay Cities."  (Dkt. 5 ¶ 10.)  In June and November 2015, at Mr. Bryant's request, Igler provided Mr. Bryant with further legal opinions regarding provisions of the draft agreement.  (Dkt. 5 ¶ 11.)

Mr. Bryant likewise contends that he has an attorney-client relationship with Mr. Igler and, thus, may assert the privilege as to the Withheld Documents, averring that he sought and received

---

[2] See *Centennial Bank v. ServisFirst Bank Inc. et al.*, Case No. 8:16-cv-00088-CEH-JSS (Dkts. 4, 79, 131) (filed Jan. 14, 2016).

legal advice from Mr. Igler regarding his "employment agreement and the acquisition of Bay Cities Bank by Centennial Bank." (Dkt. 7 ¶¶ 4–6.) He avers that he believed his communications with Mr. Igler were privileged and confidential. (Dkt. 7 ¶ 7.)

The Court must first determine whether Mr. Bryant formed an attorney-client relationship with Igler. The attorney-client privilege is codified in Section 90.502 of the Florida Statutes, which defines a "lawyer" as "a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation." § 90.502(1)(a), Fla. Stat. (2016). A "client" is "any person . . . who consults a lawyer with the purpose of obtaining legal services or who is rendered legal services by a lawyer." *Id.* § 90.502(1)(b); *Dean v. Dean*, 607 So. 2d 494, 497 (Fla. 4th DCA 1992) ("We construe this language as continuing the common law focus on subjective considerations, viz., on the person seeking consultation with a lawyer, rather than on what the lawyer does.").

Determining the existence of the attorney-client relationship turns on the client's reasonable, subjective "belief that he is consulting a lawyer in that capacity and his manifested intention is to seek professional legal advice." *Bartholomew v. Bartholomew*, 611 So. 2d 85, 86 (Fla. 2d DCA 1992) (internal quotations and citations omitted); *The Florida Bar v. Beach*, 675 So. 2d 106, 109 (Fla. 1996) (citing *Bartholomew*, 611 So. 2d 85). Contrary to Centennial's contention, the "[e]stablishment of the attorney-client relationship - and thus the attachment of the concomitant rights and duties of each side to the relationship - does not require a written agreement or evidence that fees have been paid or agreed upon." *Mansur v. Podhurst Orseck, P.A.*, 994 So. 2d 435, 438 (Fla. 3d DCA 2008).

Thus, the focus of the Court's inquiry regarding whether Mr. Bryant and Igler share an attorney-client relationship is Mr. Bryant's subjective belief that he consulted Igler with the intention of securing legal advice. *See Bartholomew*, 611 So. 2d at 86. In his sworn declaration,

Mr. Bryant avers that he communicated with Mr. Igler regarding an employment agreement and Centennial's acquisition of Bay Cities. (Dkt. 7 ¶ 4.) Mr. Bryant avers that he made these communications "with the intention of seeking legal advice" and consulted Mr. Igler in Mr. Igler's "capacity as a lawyer." (Dkt. 7 ¶ 6.) Mr. Igler "provided the requested legal advice in telephone conversations and through the" Withheld Documents. (Dkt. 7 ¶ 6.)

The Court finds that Mr. Bryant formed an attorney-client relationship with Igler because Mr. Bryant believed that he consulted Mr. Igler to obtain legal advice. Specifically, Mr. Bryant avers that he consulted with Mr. Igler in Mr. Igler's capacity as an attorney in order to obtain legal advice regarding an employment agreement and the impending acquisition of Bay Cities. Mr. Bryant's averments that he believed he was consulting Mr. Igler in Mr. Igler's capacity as an attorney with the intention to obtain legal advice are supported by the Court's *in camera* review of the Withheld Documents. Accordingly, the Court finds that Mr. Bryant and Igler formed an attorney-client relationship.

Centennial argues, however, that Igler's representation of Mr. Bryant was precluded by Igler's representation of Bay Cities because representing Mr. Bryant would allegedly create a conflict of interest. (Dkt. 3 at 23–24.) Centennial elaborates upon this argument in its Motion to Open, arguing that Igler was required to, but failed to, obtain a waiver of conflict from Bay Cities prior to advising Mr. Bryant. (Dkt. 21 ¶ 5(b).) Specifically, as set forth above, Centennial contends that, during the time Igler provided Mr. Bryant legal advice, Bay Cities was either a current or former client of Igler and, therefore, Igler's representation of Mr. Bryant was precluded because it conflicted with Bay Cities's interests. (Dkt. 21 ¶ 9.)

In response, Igler denies the existence of a conflict and argues, nonetheless, that the existence of a conflict "has no bearing on the issue of the attorney client privilege being asserted."

(Dkt. 5 at 12–13.)  Further, in response to the Motion to Open, Igler contends that, while Igler maintains there is no conflict of interest, "Centennial has yet to provide any authority that supports the proposition that the attorney-client privilege is impacted in any way, because a lawyer does not obtain a waiver of conflict" and, accordingly, the "conflict issue is a red herring." (Dkt. 29 ¶ 23.)  Mr. Bryant likewise contends that Centennial's argument regarding an alleged conflict of interest is unsupported and irrelevant to the privileged nature of the Withheld Documents.  (Dkt. 6 at 10, n.2.)  In his response to the Motion to Open, Mr. Bryant elaborates, arguing that "[t]he question of whether the attorney-client relationship creates a conflict for the attorney is not relevant" to the analysis of the formation of an attorney-client relationship and Centennial has cited no authority to support that it is relevant to the analysis.  (Dkt. 30 at 4.)

The Court finds, as described above, that the determination of whether an attorney-client relationship has been formed focuses on the client's reasonable, subjective "belief that he is consulting a lawyer in that capacity and his manifested intention is to seek professional legal advice." *Bartholomew*, 611 So. 2d at 86.  Centennial has cited no authority to support its argument that the existence, or the possibility of the existence, of a conflict of interest precludes the formation of an attorney-client relationship.  The alleged existence of a conflict of interest is, therefore, not probative of the Court's resolution of the Motion to Compel.  Accordingly, Centennial's request, in the Motion to Open, that the Court open the record to consider evidence to refute Mr. Igler's testimony regarding his representation of Bay Cities and Mr. Bryant, specifically the declaration of Mr. Thayer, is denied.

## II.    Withheld Documents 19, 20, and 23

Centennial contends that Withheld Documents 19 and 20 are not protected from disclosure by the attorney-client privilege because they are internal memoranda prepared by Mr. Igler to be

"stored in Igler's files."  (Dkt. 3 at 22–23.)  Thus, Centennial contends, because they are not confidential communications between Igler and Mr. Bryant, they are not protected from disclosure by the attorney-client privilege.  (Dkt. 3 at 23.)  In response, Mr. Bryant argues that Igler identified Withheld Documents 19 and 20 on its revised privilege log "as memorializing a '[p]hone conversation with Gregory Bryant'" and that memoranda memorializing attorney-client communications are protected by the attorney-client privilege.  (Dkt. 6 at 15.)

An attorney's notes memorializing a client's communications are protected by the attorney-client privilege.  *Swidler & Berlin v. United States*, 524 U.S. 399, 401 (1998) (holding that an attorney's "notes of an initial interview with a client . . . are protected by the attorney-client privilege" even after the client's death); *Hagans v. Gatorland Kubota, LLC/Sentry Ins.*, 45 So. 3d 73, 77–78 (Fla. 1st DCA 2010) (citing *Swidler*, 524 U.S. 399, and holding that documents created by an attorney during an initial interview of a client, memorializing the client's communications, are protected by the attorney-client privilege because, to hold otherwise, would "impose a chilling effect on an attorney's efforts to fully explore and memorialize the facts underlying his client's cause"); *Lacaretta Rest. v. Zepeda*, 115 So. 3d 1091, 1093 (Fla. 1st DCA 2013) (holding that notes prepared by a client memorializing a conversation with in-house counsel and notes by the in-house counsel "both clearly constitute or memorialize communication from the attorney to the [client] made in the rendition of legal services").  Upon *in camera* review, Withheld Documents 19 and 20 are memoranda by Mr. Igler memorializing conversations Mr. Igler had with Mr. Bryant in the furtherance of the rendition of legal services.  Those documents are protected from disclosure under the attorney-client privilege.

However, based on the Court's *in camera* review, Withheld Document 23 does not memorialize confidential communications in the furtherance of the rendition of legal services.

Rather, the communication concerns Mr. Igler's conversation with Mr. Bryant regarding an opportunity. Unlike "communications relating to the acquisition or rendition of professional legal services which have a confidential character," "[s]tatements about matters unconnected with the legal services are not privileged." *Cunningham v. Appel*, 831 So. 2d 214, 215–16 (Fla. 5th DCA 2002); *Nwabeke v. Torso Tiger, Inc.*, No. 6:04CV410-ORL-18KRS, 2007 WL 1222517, at *3 (M.D. Fla. Apr. 24, 2007) (citing *Cunningham*, 831 So. 2d 214, and explaining that the party asserting privilege must show that "each communication was with her lawyer for the purpose of rendering legal services and was intended to be confidential"); *Hoch v. Rissman, Weisberg, Barrett*, 742 So. 2d 451, 458 (Fla. 5th DCA 1999) (emphasis in original) ("The privilege does not extend to every statement made to a lawyer. If a statement is about matters unconnected with the business at hand or in general conversation, the matter is *not* privileged.").

Thus, "[a]n attorney's involvement in, or recommendation of, a transaction does not place a cloak of secrecy around all the incidents of such a transaction." *Boyles v. Mid-Florida Television Corp.*, 431 So. 2d 627, 639 (Fla. 5th DCA 1983). Although Withheld Document 23 is a communication between Mr. Igler and Mr. Bryant, that communication does not constitute a confidential communication in the furtherance of the rendition of legal services to Mr. Bryant regarding his employment agreement, but instead is a communication between Mr. Bryant and Mr. Igler regarding a potential opportunity. Accordingly, Withheld Document 23 is a communication unconnected with the rendition of legal services and is not protected by the attorney-client privilege. The Motion to Compel is granted as to Withheld Document 23, and denied as to Withheld Documents 19 and 20.

## III.     Confidentiality of Communications Over Mr. Bryant's Bay Cities E-Mail Account

In its revised privilege log, Igler states that Bay Cities had access to Withheld Document 15, which is described as a letter dated June 18, 2015, authored by Mr. Igler and received by Mr.

Bryant with the subject matter, "[o]pinion on Bryant employment agreement." (Dkt. 3-5.) In a letter from Igler to Centennial's counsel transmitting the revised privilege log, Igler explained that it listed Bay Cities as having access to the letter because "the document was sent to Greg Bryant by email to his address at Bay Cities." (Dkt. 3-6.) Upon *in camera* review, Withheld Documents 15, 16, and 17 are communications between Mr. Igler and Mr. Bryant using Mr. Bryant's Bay Cities e-mail account.

Centennial contends that Mr. Bryant had no expectation of privacy in communications with Igler made using Mr. Bryant's Bay Cities e-mail account because Mr. Bryant's Bay Cities e-mail account was subject to monitoring by Bay Cities. (Dkt. 3 at 24–25.) In support of its argument, Centennial quotes Bay Cities's Personnel Policy ("Bay Cities Policy"), which provided as follows: "Telephones, voice mail systems, and computers, including electronic mail systems (e-mail) are provided for business use. Excessive personal use of these devices is prohibited. Communication through these devices is subject to monitoring by the bank . . . ." (Dkt. 3-7 at 11.) Thus, Centennial argues, the attorney-client privilege does not apply to any communications between Mr. Bryant and Igler that were made using Mr. Bryant's Bay Cities e-mail account because Mr. Bryant had no expectation of privacy in such communications. (Dkt. 3 at 25.) At the hearing, Centennial's counsel also contended that Centennial acquired all of Bay Cities's assets in the acquisition, including Bay Cities's computer hardware and software, but that Centennial donated Bay Cities's computers to charity. (Dkt. 23.) Thus, Centennial contended, had it not been for this donation, Centennial would possess the Withheld Documents, which were stored on the donated computers' hard drives. (Dkt. 23.)

In response, Mr. Bryant avers that he believed that all communications he had with Igler were confidential. (Dkt. 7 ¶ 7.) Specifically, he avers that he was "not aware of anyone who had

access to or otherwise monitored" his e-mails, referring to his Bay Cities e-mail account.  (Dkt. 7 ¶ 9.)  Further, he believed his e-mails to be confidential given his "role as CEO," which required him "to engage in confidential communications to fulfill that role."  (Dkt. 7 ¶ 9.)  Addressing the Bay Cities Policy, Mr. Bryant avers that although the Bay Cities Policy provided that employee e-mails were subject to monitoring by Bay Cities, "the bank did not actually monitor employees' emails in the normal course of business."  (Dkt. 7 ¶ 10.)  Further, because he was CEO, he "would have been the ultimate decision-maker about whether employee emails should actually be monitored," but he "never instructed anyone to do so."  (Dkt. 7 ¶ 10.)  Thus, Mr. Bryant contends, his "communications with Igler through [his] work email account . . . were made and received by [him] with the expectation and intent that they were confidential and privileged."  (Dkt. 7 ¶ 9.)

### A.    The Attorney-Client Privilege Protects Disclosure of Confidential Communications

As a client of Igler, Mr. Bryant "has a privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications when such other person learned of the communications because they were made in the rendition of legal services to the client."   § 90.502(2), Fla. Stat. (2016).   Communications between a client and lawyer are confidential if they are "not intended to be disclosed to third persons other than . . . [t]hose to whom disclosure is in furtherance of the rendition of legal services to the client" or "[t]hose reasonably necessary for the transmission of the communication."   *Id.* § 90.502(1)(c); *Cunningham*, 831 So. 2d at 215 (interpreting Section 90.502 and explaining that "[a] communication between an attorney and client is deemed confidential if it is not intended to be disclosed to third persons, other than those to whom disclosure is necessary in furtherance of rendition of legal services").   "Basic to the assertion of the attorney-client privilege is that the communication in question must have been made in confidence."  *Schetter v. Schetter*, 239 So. 2d

51, 52 (Fla. 4th DCA 1970) (citing *Wilcoxon v. United States*, 231 F.2d 384, 386 (10th Cir. 1956)

("In order to be privileged, a communication must be made in confidence of the relationship and

under circumstances from which it may reasonably be presumed that it will remain in

confidence.")).

"Whether a communication is confidential depends on whether the person invoking the

privilege knew or should have known that the privileged conversation was being overheard."

*Mobley v. State*, 409 So. 2d 1031, 1038 (Fla. 1982) (citing *Proffitt v. State*, 315 So. 2d 461, 464–

65 (Fla. 1975) (analyzing whether communications between a husband and wife were privileged

despite being overheard by a third party and holding that "the privilege[d] character of the

communication was lost" because the couple was "speaking in a manner and place where they had

a reasonable chance of being overheard, and they knew of that possibility at that time" and, thus,

"it is clear that there was no attempt to make the communication in confidence")); *Black v. State*,

920 So. 2d 668, 670 (Fla. 5th DCA 2006) (quoting *Mobley*, 409 So. 2d 1031, and citing *Proffitt*,

315 So. 2d 461, stating that "[t]he lesson to be derived from these cases is that the confidentiality

of a conversation is dependent upon 'whether the person invoking the privilege knew or should

have known that the privileged conversation was being overheard'").

Courts examine whether the person invoking the privilege had a reasonable expectation

that an attorney-client communication was made in confidence.  *McWatters v. State*, 36 So. 3d

613, 636 (Fla. 2010) (holding that an inmate who called his attorney from prison had "no

reasonable expectation of privacy" in the communication because the prison's telephone system

played a recording "before each conversation that advised the inmate: 'This call is subject to

monitoring and recording'"); *Schetter*, 239 So. 2d at 52 (internal quotations omitted) (holding that,

to enjoy the privilege against disclosure, an attorney-client communication must be made in

confidence and "under circumstances from which it may reasonably be presumed that it will remain in confidence").

Moreover, although decided in the context of the expectation of privacy under the Fourth Amendment to the United States Constitution, in *State v. Young*, Florida's First District Court of Appeal has held that "where an employer has a clear policy allowing others to monitor a workplace computer, an employee who uses the computer has no reasonable expectation of privacy in it." 974 So. 2d 601, 609 (Fla. 1st DCA 2008).[3]   In *Young*, a defendant's employer provided the defendant with a computer in a private office. *Id.* a 606.  "[T]here was no official policy regarding the use of the computer or others' access to it" and the computer "was not networked to any other computer, and it was kept in his private office." *Id.*   The First District explained that "[t]o invoke the protection of the Fourth Amendment, a criminal defendant must establish standing by demonstrating a legitimate expectation of privacy in the area searched or the item seized," which "consists of both a subjective expectation and an objectively reasonable expectation, as determined by societal standards." *Id.* at 608.

"[T]he reasonableness of an employee's expectation of privacy in his or her office or the items contained therein depends on the operational realities of the workplace," and "[w]hen a computer is involved, relevant factors include whether the office has a policy regarding the employer's ability to inspect the computer, whether the computer is networked to other computers,

---

[3] Similarly, although not applying Florida law, certain federal courts have adopted a four-factor test to determine whether there was a reasonable expectation of privacy in the context of e-mail transmitted over and maintained on a company server.  *See In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 257–58 (Bankr. S.D.N.Y. 2005); *In re Reserve Fund Sec. & Derivative Litig.*, 275 F.R.D. 154, 159–60 (S.D.N.Y. 2011) (listing cases adopting the four-factor test); *Leor Expl. & Prod. LLC v. Aguiar*, No. 09-60136-CIV, 2009 WL 3097207, at *4 (S.D. Fla. Sept. 23, 2009) (applying the four-factor test).  In determining this issue, courts have considered the following four factors: (1) whether the corporation maintains a policy banning personal or other objectionable use; (2) whether the company monitors the use of the employee's computer or e-mail; (3) whether third parties have a right of access to the computer or e-mails; and (4) whether the corporation notifies the employee, or whether the employee was aware, of the use and monitoring policies.  *See Asia Global*, 322 B.R. at 257.

and whether the employer (or a department within the agency) regularly monitors computer use." *Id.* at 608–09.  Under the specific circumstances in *Young*, the First District concluded that the defendant had an objectively reasonable expectation of privacy in his computer because "[u]nlike in the federal cases finding no expectation of privacy in a workplace computer, the [employer] in the instant case had no written policy or disclaimer regarding the use of the computer" and "[t]he only way to access the computer to view its contents was to enter through the locked office door." *Id.* at 611.

### B. Whether Communications Sent Using Mr. Bryant's Bay Cities E-Mail Account Were Confidential – Withheld Documents 15, 16, and 17

The Court must determine the application of the attorney-client privilege under Florida law in this diversity action.  *Somer*, 704 F.2d at 1478.  The parties have not cited relevant Florida caselaw in which Florida courts examine whether communications sent to a client's e-mail account that is subject to monitoring are confidential and, thus, protected from disclosure by the attorney-client privilege.

Florida's Fourth District Court of Appeal examined waiver of the attorney-client privilege in the context of whether the privilege was waived as to communications sent by facsimile from counsel to the client's facsimile machine, which was used by many members of the client's office. *Nova Se. Univ., Inc. v. Jacobson*, 25 So. 3d 82 (Fla. 4th DCA 2009).  There, an employee of a school sued the school for wrongful termination.  *Id.* at 84.  While working at the school, the employee was using the school's facsimile machine and the school received a letter, via facsimile, from the school's legal counsel regarding the employee's lawsuit against the school.  *Id.*  The employee saw and read the letter.  *Id.*  The school moved for a protective order to prevent the employee from referring to the letter in depositions, asserting that the letter was protected by the attorney-client privilege.  *Id.* at 84–85.  The trial court examined whether the privilege was waived

by inadvertent disclosure, which requires the application of factors, including "the reasonableness of the precautions taken to prevent inadvertent disclosure." *Id.* at 85–86.

The Fourth District stated that the facts of the case were analogous to "those cases involving overheard conversations, where the client knew or should have known that the conversation was overheard by a third person," where "courts have held that where the communication is made in the presence of others, it does not evince an intent to keep the conversation confidential, and the privilege is lost." *Id.* at 86 (citing *Mobley*, 409 So. 2d 1031, and *Proffitt*, 315 So. 2d 461).  The Fourth District found that "the fact determination in the overheard conversation cases is similar to the first step of the . . . inquiry regarding the reasonableness of the precautions to prevent inadvertent disclosure." *Id.*  The trial court, the Fourth District noted, had not made findings regarding the reasonableness of the precautions taken to prevent inadvertent disclosure, and stated that "[w]e have found no case deciding this issue." *Id.* at 86–87.  Because the trial court had not made such findings, the Fourth District remanded the case for the trial court to make further findings regarding "what measures were taken to protect against inadvertent disclosure," instructing specifically as follows:

> The inquiry must focus on whether the *client* knew or should have known that the letter sent by the attorney would be viewed by third parties. Whether the use of the fax machine to send the communication negates a claim that the matter was sent in confidence requires a fact-intensive determination. Such an inquiry might include, but would not be limited to: whether the client authorized the attorney to use that fax machine to send confidential letters; the extent to which the fax machine was used generally by the staff without assistance from the secretaries; the extent to which the intended recipients knew that the fax was used by other personnel; and finally whether the letter was accompanied by an attorney-client privilege notice.

*Id.* at 88–89 (emphasis in original).

As set forth above, under the Florida law governing the attorney-client privilege, a client may prevent the disclosure of "confidential communications," which are communications that are "not intended to be disclosed to third persons" other than third persons to whom disclosure is

necessary to transmit the communication or further the rendition of legal services.  § 90.502, Fla. Stat. (2016).  "Whether a communication is confidential depends on whether the person invoking the privilege knew or should have known that the privileged conversation was being overheard." *Mobley*, 409 So. 2d at 1038.  The person asserting the privilege must have had a reasonable expectation that the attorney-client communication was made in private.  *McWatters*, 36 So. 3d at 636.

Here, Mr. Bryant acknowledges that he communicated with Mr. Igler through his "work email account" (Dkt. 7 ¶ 9), which Igler states was done at Mr. Bryant's request.  (Dkt. 5 ¶ 10.) Withheld Documents 15, 16, and 17 are communications between Igler and Mr. Bryant using Mr. Bryant's Bay Cities e-mail account.  None are not marked or labeled "attorney-client privileged" in the correspondence.  As set forth above, the Bay Cities Policy states that e-mail was provided to employees for business use and, although personal use was permitted, excessive personal use was prohibited. (Dkt. 3-7 at 11.)  Importantly, the Bay Cities Policy warned that "[c]ommunication through these devices [including e-mail] is subject to monitoring by the bank."  (Dkt. 3-7 at 11.) Mr. Bryant avers that he was aware of the Bay Cities Policy that e-mails were subject to monitoring by Bay Cities.  (Dkt. 7 ¶ 10.)  Mr. Bryant, however, communicated with Igler using his Bay Cities e-mail account at Mr. Bryant's request and neither Igler nor Mr. Bryant marked these communications as privileged.  Thus, Mr. Bryant communicated with Mr. Igler using his Bay Cities e-mail account when he "knew . . . that the privileged conversation [could be] overheard." *Mobley*, 409 So. 2d at 1038.

Mr. Bryant avers, however, that Bay Cities "did not actually monitor employees' emails in the normal course of business" and, as CEO, he never instructed employees' e-mails to be monitored.  (Dkt. 7 ¶ 10.)  While Mr. Bryant's averment demonstrates that he did not believe that

his e-mails on his Bay Cities e-mail account were monitored, his averment is undermined by the explicit language of the Bay Cities Policy.  Specifically, because the Bay Cities Policy "warned that all [communications] are [subject to] monitor[ing]," Mr. Bryant's subjective belief about whether Bay Cities monitored its e-mail accounts was unreasonable and thus, he had "no reasonable expectation of privacy" in e-mails sent and received on his Bay Cities e-mail. *McWatters*, 36 So. 3d at 636; *See Young*, 974 So. 2d at 609 ("[W]here an employer has a clear policy allowing others to monitor a workplace computer, an employee who uses the computer has no reasonable expectation of privacy in it.").  Thus, Mr. Bryant's communications using his Bay Cities e-mail account cannot be said to have been made in confidence "under circumstances from which it may reasonably be presumed that [they] will remain in confidence." *Schetter*, 239 So. 2d at 52 (internal quotations and citations omitted).

Therefore, the Court concludes that Mr. Bryant cannot assert the attorney-client privilege as to Withheld Documents 15, 16, and 17 because these are communications with Igler using Mr. Bryant's Bay Cities e-mail account.  Withheld Document 17 is a copy of Withheld Document 16, an e-mail from Mr. Bryant to Mr. Igler sent on June 29, 2015 on Mr. Bryant's Bay Cities e-mail account.   Withheld Document 17, however, also contains handwritten notes described as "marginalia" in the privilege log.  From *in camera* review, the "marginalia" are handwritten notes written on a printed copy of the e-mail that are presumably Mr. Igler's handwritten notes, which memorialize communications with Mr. Bryant.  These handwritten notes are dated July 1, 2015, a couple of days after Mr. Bryant sent Mr. Igler the e-mail on which the handwritten notes are written.  Based on the Court's review of Withheld Document 17, it does not appear, nor does the privilege log reflect, that the handwritten notes written on the printed copy of the e-mail were sent to Mr. Bryant's Bay Cities e-mail account.  Rather, it appears that they are Mr. Igler's handwritten

notes memorializing confidential communications with Mr. Bryant on July 1, 2015, made in the furtherance of the rendition of legal services that were not transmitted to Mr. Bryant's Bay Cities's e-mail account.  Therefore, the handwritten notes are protected from disclosure by the attorney-client privilege, *Swidler*, 524 U.S. at 401, and must be redacted.

Withheld Documents 26 and 27, on the other hand, are communications between Mr. Bryant and Igler in which Mr. Bryant seeks and Igler provides legal advice regarding provisions of Mr. Bryant's employment agreement that were *not* made using Mr. Bryant's Bay Cities e-mail account.  Rather, these communications are between Mr. Igler and Mr. Bryant made using Mr. Bryant's private e-mail address with no third persons copied.  Unlike his Bay Cities e-mail account, which was subject to monitoring, Mr. Bryant had a reasonable expectation that the attorney-client communications in Withheld Documents 26 and 27 were made in private.  Thus, they are confidential communications protected from disclosure by the attorney-client privilege.

Therefore, the Motion to Compel is granted as to Withheld Documents 15, 16, and 17, although the handwritten notes on Withheld Document 17 must be redacted as they are protected by the attorney-client privilege, and the Motion to Compel is denied as to Withheld Documents 26 and 27.  Accordingly, it is

**ORDERED**:

1.      Centennial Bank's Amended Motion to Compel Complete Responses to Subpoena to Produce Documents Served on Igler& Pearlman, P.A. (Dkt. 3) is **GRANTED** in part as to Withheld Documents 15, 16, 17 (redacted), and 23 and **DENIED** in part as to Withheld Documents 19, 20, 26, and 27.

2.       Igler is directed to serve Withheld Documents 15, 16, 17 (redacted), and 23 on Centennial's counsel within thirty (30) days of this Order.

3.      Centennial's Motion to Open the Record Regarding Igler & Pearlman Discovery Controversy (Dkt. 21) is **DENIED**.

4.      The Declaration of A. Bronson Thayer (Dkt. 25), filed by Centennial Bank on August 24, 2016, is **STRICKEN** from the record.

**DONE** and **ORDERED** in Tampa, Florida on October 14, 2016.

_____
JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record